UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID STEBBINS,                                                          PLAINTIFF

VS.                                     Case  24 - 1174

RUMBLE, INC.
JOHN DOE, d.b.a. THE SPECTER REPORT                    DEFENDANTS

## COMPLAINT

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following complaint for six (6) counts of copyright infringement and one (1) count of slander.

### I: PRELIMINARY MATTERS

#### I-1: Related Cases

1. The following cases are tangentially related to this case, so the Court may choose to keep them on hand when reviewing this case:

##### I-1-A: The subpoena case

2. First, there is Case 1:24-mc-478 in the US District Court for the District of Delaware ("the subpoena case"). In that case, I am seeking to obtain a supboena under 17 USC § 512(h) to identify three individuals, one of them being the defendant in this case.

##### I-1-B: The SidAlpha case

3. Second, there is Case 3:23-cv-00321-MMC in the US District Court for the Northern District of California ("the SidAlpha case"). This was also a slander case, and it concerns very similar slander to what I am suing for in this case: Accusing me of not considering fair use before issuing a DMCA Takedown Request.

##### I-1-C: The Baz case

4. Then, there is Case 3:24-cv-00398-LJC in the US District Court for the Northern District of California ("the Baz case").

5. While not *directly* related to this case, it is similar in that both Thiago Baz and the individual defendant in this case have nearly identical cases for fair use: Reacting to my entire video, copying 100% of that video (literally every single last second of it), and still loudly and vulgarly insisting that the reaction is still fair use solely because of the fact that they are providing criticism. I see no good reason why one should be considered fair use but the other fails that test. Either both are fair use or both are unfair; there is no in between.

6. To that end, it is worth noting that the judge in that case has explicitly found the copyright infringement claims to be valid and have alleged sufficient facts, thus allowing those claims to proceed. See Dkt. 13, Page 3, Lines 14-15 ("The Court finds no basis for dismissal of

Stebbins's copyright infringement claims and would allow those claims to proceed").

### I-1-D: The Kiwi Farms case

7.  Fourth, there is Case 2:24-cv-00140 in the US District Court for the Southern District of West Virginia ("the Kiwi Farms case").

8.  Like the Baz case, that case is also identical in merit (for better or worse) to the instant case insofar as it concerns copyright infringement. However, unlike the Baz case, the Kiwi Farms case is even more directly related to the instant case because both the Kiwi Farms case and this one involve a reaction to the same original video. Thus, there is even less reason for the courts to reach different verdicts.

## I-2: Identities of the Parties

9.  I am a YouTuber and Twitch streamer who goes by the alias "Acerthorn." My YouTube channel can be found at the url of `www.youtube.com/@acerthorn`, and my Twitch channel can be found at the url of `www.twitch.tv/acerthorn`.

10. The first defendant, Rumble Inc. ("Rumble"), owns and operates the eponymous video-sharing website www.rumble.com, which is a direct competitor to YouTube. They are incorporated in the State of Delaware. See ECF 2, Exhibit B in the subpoena case mentioned above. They can be served with process at the following agent's name and address:

> Corporation Service Company
> 251 Little Falls Dr.,
> Wilmington, DE 19808

11. The second Defendant is an unknown person who goes by the online alias "Spectre 06 Gaming" on YouTube and "the Specter Report" on Rumble. His YouTube channel can be found at the URL of `https://www.youtube.com/@Spectre06Gaming`, while his Rumble channel can be found at the URL of `https://www.rumble.com/c/TheSpectreReport`. Until I learn his real name, I will refer to him as "Spectre" for the remainder of this Complaint.

12. Rumble allows its creators to begin monetization immediately, with no size requirements like YouTube has. Therefore, Spectre's videos on Rumble are all monetized. He hasn't made very much money, but he has made *some* money.

13. I do not currently know Spectre's legal name or address. However, I am currently looking to obtain this information in the subpoena case mentioned above. If, upon responding to the supboena, Rumble is still unable to identify the defendant, then the defendant can be served with process via email[1] at the email address of `spectre6gaming@gmail.com`.

---

1   Federal district courts are allowed to authorize service of process under any method otherwise permissible in that state's rules of civil procedure. See Fed.R.Civ.P. 4(e)(1). In Delaware, service of process can be conducted in any manner proscribed by the court. See Del.R.Civ.P. 4(f)(1)(II)(vi). In other states that have similar language int heir rules of civil procedure (such as California), federal courts have interpreted that as giving them discretion to authorize service of process by email. See Miller v. Ceres Unified Sch. Dist., No. 15-cv-0029, 2016 WL 4702754, at *3 (E.D. Cal. Sept. 7, 2016).

14. He claims (and has no reason to lie about this) that he is a veteran of the United States Marine Corps, so if I end up serving him via email and get a default judgment, it shouldn't be too difficult for a professional to tack him down to collect on the judgment, and as long as I get a big judgment, it shouldn't be too difficult for me to find a professional willing to do so for no money upfront in exchange for a percent of money they collect.

### I-3: Jurisdiction and Venue

15. This Court has federal question jurisdiction over this case because this is a matter of copyright infringement. It subsequently may exercise supplemental jurisdiction over the corresponding slander claim.

16. This Court has personal jurisdiction over Rumble because they are incorporated in the State of Delaware[2], as explained above and as explained in the subpoena case. From there, this Court can then exercise long-arm jurisdiction over Spectre as a co-defendant.

## II: FACTS OF THE CASE

17. The following facts are necessary to understand this case:

### II-1: My Interests as a YouTuber

1. As a YouTuber, my job is to create videos and upload them to YouTube. I am a member of the YouTube Partner Program, which means that, whenever advertisements play on my videos, I am eligible to receive a portion of that revenue. The more views my videos get, the more ad impressions get shown to viewers, which in turn increases my ad revenue. As such, everything I do as a YouTuber should be geared towards getting more views on my videos.

2. Youtube has an extremely complex algorithm that is used to determine how many views my videos get. While nobody except the highest-ranking employees at YouTube know exactly how the algorithm works, the general consensus is that the following factors are most important:

- **Click-through Rate**: Whenever a video's thumbnail and title is shown to a viewer with the chance to click on it to watch the corresponding video, that is known as an "impression." The percentage of impressions that result in a click is known as the click-through rate, or CTR for short.
- **Average view duration**: Whenever a viewer watches long stretches of a video, that is typically a good sign that the video is itneresting to them and keeps their attention.
- **Binging**: If you not only watch the entirety of a video (thereby giving it 100% average view duration), but then *immediately* click on another video from the same channel and

---

2 Although Rumble's terms of service state that we agree to litigate all matters in Canada, where they are originally from, that choice of law clause only applies to claims arising out of my use of the service. The claims of the instant case arise out of Spectre's use of the service, and I am not in privity with any contract Rumble and Spectre may or may not have entered into with each other. So I am not bound by their choice of law clause.

Besides, I never agreed to their terms of service anyway. I only created an account with them in order to monitor Spectre's actions on the platform, not so I could use the site for casual video watching and/or uploads, like I do YouTube. Therefore, because my use of the site was purely investigatory in nature, I cannot be held to their terms of service. To hold otherwise would put me in an unfair Catch-22.

watch it as well, that typically results in far more algorithmic support than if those same two videos were watched with a period of time in between, all else being equal.
- **Engagement**: Comments, likes, even dislikes all count as engagement for purposes of algorithmic support. While not as important as CTR or watch time, the general consensus is that engagement will keep people on the site longer, thereb viewing more ads.

3.   As such, everything I do as a YouTuber should be geared towards improving my overall algorithmic support. However, in order to get algorithmic support, the views, watch time, and engagement (e.g. comments) all have to happen *on YouTube*. If the watch time and engagement happens on any other site, YouTube obviously cannot factor that into its algorithm, which means my channel does not grow, get more viewers, and ultimately get more revenue.

## II-2: My Copyrights

4.   I own the following copyrights:

### II-2-A: Copyrighted Music

5.   In February of 2023, I contracted with a composer in Argentina by the name of Augustin Navarro to compose ten original songs for my channel.

6.   The titles for these ten songs are as follows:

   (a)   Acer's High
   (b)   Long Prat Fall
   (c)   Sigh of Relief
   (d)   Section of Life
   (e)   Sample of Life
   (f)   Epic Moment
   (g)   Blinding Rage
   (h)   There Is No Hope
   (i)   Smile on My Face
   (j)   Ready for Action

7.   You can listen to these songs by going to the following unlisted playlist on YouTube:

`www.youtube.com/playlist?list=PLpL3n7W6QqgBB_ZRVducMkGN3CRaz3isQ`

8.   However, you will have to pay my channel at least $1 per month to be able to listen to these songs. Maybe, once this case gets underway, I can file under seal so the Court can hear these songs for free without me giving away free samples to the public.

9.   These were works for hire, which means that I own 100% of the copyright to these songs. These songs are legally eligible to be works for hire because they were intended to be used as background music for my YouTube channel. Therefore, they qualify as "supplementary works," specifically they were composed "as a part of a motion picture or other audiovisual work," thereby meeting the legal definition to be a work for hire under 17 USC § 101.

10.   Barring that, Navarro and I signed a contract, written by an American attorney at our

behest, stating that, even if these songs are not legally eligible to be works for hire, he was still *selling* the copyrights to me. When I showed this contract to Identifyy[3], they accepted this contract as proof that I was indeed the sole copyright owner (although my attempts to do business with them fell through the cracks for other reasons), so I am confident this Court will accept this contract as proof that I am copyright holder, once I disclose it in discovery.

11.   In any event, I registered the copyright for these ten songs before I began using them in any of my videos. The registration number for these ten songs is Sru001538491. The effective date of registration is March 5, 2023.

12.   Although I have registrations for these ten songs, and these songs will invariably be included in all of my YouTube videos going forward (meaning anyone who copies any portions of my videos will, almost invariably, be copying portions of these songs as well), it is not necessary for a secondary user to criticize these songs, specifically, in order to be eligible for the "fair use" defense. My *registration* of these songs can be used as a work-around to keep me from expensively having to *register* each individual video every time it gets infringed upon, but it is not a work-around that gets around fair use law. As long as a secondary user makes a fair use of whatever videos contain these songs, their use of the music itself should also be classified as fair use. However, that still requires they actually *make fair use* of the videos, and as this Court is surely aware (and which many people on the Internet frequently get wrong), fair use requires more than just providing criticism. Criticism is certainly a good first step to fair use, but it's only one factor.

<u>II-2-B: The March 12, 2024 video "Kiwi Farms Goes to the Supreme Court; It Will Most Likely Fail, and Here's Why."</u>

13.   On March 12, 2024, I posted a video to my YouTube channel called "Kiwi Farms Goes to the Supreme Court; It Will Most Likely Fail, and Here's Why." The video can be viewed at the following URL:

```
https://www.youtube.com/watch?v=5gXZEesiwvw
```

14.   During this video, I acknowledged the factual development mentioned in Section III-1-A and explained how I, in my personal, non-binding laymen's opinion, did not believe the Supreme Court was likely to grant the Petition for Writ of Certiorari in Joshua Moon's case. Nothing in that video was meant to be construed as legal advice, and in fact, I even provided a source from a well-respected Supreme Court law firm to back up my arguments so my viewers didn't have to simply take my word for it.

15.   Throughout the video, I used six of my ten copyrighted songs as background music. The six songs used, and the timestamps in which they were used, are as follows:

   (a)   From timestamp 0:00 – 0:54, "There is No Hope" plays in the background.
   (b)   From timestamp 0:54 – 4:40, "Acer's High" plays in the background.
   (c)   From timestamp 4:40 – 8:03, "Ready for Action" plays in the background.
   (d)   From timestamp 8:03 – 13:59, "Sample of Life" plays in the background.
   (e)   From timestamp 13:59 – 17:43, "Section of Life" plays in the background.

---

3   Identifyy – spelled with two Y's at the end – is an online company that assists musical artists in registering their songs for YouTube's "Content ID" system, so they can place copyright claims on videos which use those songs.

    (f)    From timestamp 17:43 – 18:50, "Sigh of Relief" plays in the background.

16.    This means that anyone who reposts this video in its entirety infringes on *six* different copyrights, aka $4,500 - $900,000 in statutory damages worth of copyright infringements. Of course, fair use is still a defense, but fair use requires more than just providing a little bit of token criticism here and there.

17.    Also, in the description of that video, you can see that I included the message "© Acerthorn, 2024 All Rights Reserved." This entitles me to the benefits of 17 USC § 401(d).

<u>II-2-C: The songs and video are all unpublished</u>

18.    It is also worth noting that all ten songs, as well as the video, all fit the legal definition of "unpublished." This is because they were only ever posted to YouTube. A work is not considered "published" simply because it is posted online. This is established by "Circular 66," which is published by the US Copyright Office. You can find that document at the following URL:

    `https://www.copyright.gov/circs/circ66.pdf`

19.    On pages 4-5 of that circular, it says in pertinent part ...

> "The fact that a work has been placed online or posted on a website does not necessarily mean that the work has been published. The Office considers a work published when copies of it are distributed to the public by sale or other transfer of ownership if the copyright owner authorizes the end user to retain copies of the work. ***Merely displaying or performing a work online generally does not constitute publication.*** ... ***Just because an end user can technically reproduce a work does not necessarily mean that the work has been published.*** A copyright owner must have expressly or implicitly authorized users to make ***retainable copies*** of a work by downloading, printing, or other means for the work to be considered published.
>
> The concepts of authorization and publication can be complicated and may have serious consequences for the author or copyright owner. For this reason, ***the Office generally lets the applicant decide whether a particular work is published or unpublished.*** In making this determination, you may wish to consider the following general guidelines.
>
> • Work made available only by streaming. ***Streaming is a performance***, which, in and of itself, ***does not constitute publication***, because, as a practical matter, the end user does not retain a copy of the work when the performance ends.
>
> • ***Work for which downloading or reproduction is expressly prohibited. If there is a notice on a website in the terms of service for the site or another obvious place indicating that a work or the content on the site cannot be downloaded, printed, or copied, the work or content may be deemed unpublished***, because the end user is not authorized to download, print, or otherwise distribute copies."

20.    Important sections of that excerpt were bolded and italicized for emphasis.

21. Applying these rules to the instant case, none of the copyrighted works in question here qualify as "published." They are merely "performed" on my YouTube channel, not licsensed or sold. There was no option to download these works for offline viewing, except by third party means. YouTube expressly forbids downloading any videos off of their site except through the methods they themselves provide[4], nor have I hosted any of these songs, or March 12 video, on any other services besides Twitch or YouTube, so there is no way I posted it to any website which explicitly authorizes third party downloading.

22. However, even if my understanding of the facts is wrong, it ultimately doesn't matter. Bear in mind that Circular 66 says that, sometimes, it may be "unclear" whether this counts as a "publication." Earlier in that excerpt, they also stated that, whenever it is ambiguous, ***the copyright owner gets to decide*** whether it is published or unpublished! This means that the burden falls to the defendants to prove, not just that I am wrong about this, but that I am objectively unreasonable in forming my belief. If there is any ambiguity in the facts, my preference is entitled deference. Therefore, the songs and video are still legally classified as "unpublished" and there's no two ways about it.

### II-3: The Infringement

18. On March 18, 2024, Spectre posted a stream to his Rumble channel where he reacted to the aforementioned video about Kiwi Farms. If the video were still up, it could be viewed at the following URL:

```
https://rumble.com/v4k11xu-commentary-critique-acerthorns-kiwi-
                  farms-video.html?e9s=src_v1_ucp
```

19. In this reaction, he copied 100% of the original video, literally every single last second of it. He may have *added* a few moments of original content, but he *subtracted* nothing.

20. In the rare event he paused to actually give commentary, what little commentary he did provide is the very definition of "threadbare." For example, at timestamp 26:16 – 26:43, he merely acknowledged that I do editing in my intro. That's it. That's all he said. He didn't offer any opinion as to whether my intro was good or bad, just that it *exists*. That is the epitome of "bare minimum." Later, at timestamp 43:56 - 44:16, when I point out that a previous infringement was committed on Kiwi Farms "with the express intention of preventing people from accidentally giving Greer money," his entire commentary for that section of the video was "citation fucking needed on that one." Asking for a citation is not transformative. That is literally the bare minimum commentary you could possibly provide.

21. On August 30, 2024, I first learned of this reaction video, and so I issued a DMCA Takedown Request to Rumble. They removed the video a few days later.

### II-4: Reading and Reacting to my Kiwi Farms complaint

---

4  See https://www.youtube.com/t/terms:

"The following restrictions apply to your use of the Service. You are not allowed to:
1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders"

22. On March 24, 2024, Spectre made another stream where he read and reacted to the Complaint I filed in the Kiwi Farms case mentioned above. This stream was titled "Turkeygoblin vs. Dear Feeder Acerthorn Files Another Lolsuit." If the stream were still up, it could be viewed at the following URL:

> `https://rumble.com/v4l8udk-turkeygoblin-vs.-dear-feeder-acerthorn-files-another-lolsuit.html?e9s=src_v1_ucp`

23. On August 30, 2024, I learned of this video and reported it to Rumble's moderation team, not for copyright infringement, but for violating Rumble's Terms of Service which specifically said that users of the site "may not post or transmit any message which is abusive, inciting violence, harassing, harmful, hateful, anti-semitic, racist or threatening." Rumble apparently agreed and removed the video.

24. I am not suing for anything in this video, but it is relevant to the instant case because, by reading and reacting the complaint in that case, he also necessarily read ¶¶ 62-89 of that Complaint, where I explain in great detail why I believe that infringement fails the test for fair use. Since I explained in Sec. I-1-D above, that case is effectively identical in merit to the instant case, so the arguments contained therein are also applicable here. Therefore, Spectre necessarily has actual knowledge of my interpretation of fair use law. Keep that in mind when we discuss the next section.

### II-5: The slander video

25. After I had his illegal videos about me taken down, on September 2, 2024, Spectre did another stream ("the slander video"), this time called "Acerthorn Impromptu Livestream." This time, the video is still up, as of the time of this writing, and you can view it at the following URL:

> `https://rumble.com/v5dcseq-acerthorn-impromptu-livestream.html`

26. Most of this stream is just his opinion about how butthurt he is that I'm standing up to his bullying. But there was at least one moment where he gave a statement of cast-iron objective fact: At timestamp 2:57, he says "he does not consider fair use."

27. In making this statement, it is important to understand that Spectre is not accusing me of doing an unethical thing, but an illegal thing. The three words "consider fair use" are a direct reference to the case law of Lenz v. Universal Music Corp., 815 F. 3d 1145 (9th Cir. 2015), which holds that copyright holders and/or their DMCA agents "must consider fair use" whenever they issue DMCA Takedown Requests, otherwise they are liable under 17 USC § 512(f).

28. In other words, by accusing me of not considering fair use, he is, in no uncertain terms, accusing me if ***breaking the law***. This elevates this slander from defamation per quod to defamation per se, both because he is accusing me of committing a crime of moral turpitude and also because he is accusing me of being unfit for my chosen profession (YouTube content creator) and correspondingly hurts me in that trade[5].

---

5   Disparaging statements intending to hurt someone in their trade or business are considered defamation per se in Delaware. See `https://kellywarnerlaw.com/delaware-defamation-laws`.

29.     This statement is absolutely false. I explained how I do not believe Sepctre's video falls under fair use when I issued the DMCA Takedown Notice. See Dkt. 2, Exhibit F in the Subpoena case. I took the portion of that email where I addressed fair use and copied that into a word processor file, and then did a word count. It said that this section of the email contained 1,346 words.

30.     So I ask you this: How can I possibly have not considered fair use when I literally wrote well over a thousand words *literally considering fair use?!* Clearly, Spectre is lying when he says I don't consider fair use.

31.     And I mean it when I say that he is "lying," not just wrong. As I pointed out last section, he already read my complaint in the Kiwi Farms case. So he already knows what my position on fair use is. Of course, he *disagrees* with me regarding how fair use works. But lest we forget that he is not simply accusing me of being frivolous in my interpretation of the law. Again, he is not accusing me of doing something scummy; he is accusing me of doing something *illegal*.

32.     The Lenz Court unequivocally held that, in order to "not consider fair use" to such a degree that I am breaking the law, it is not enough that I make an "inadequate" or "insufficient" consideration of fair use. That case unequivocally requires that I conduct literally no fair use consideration whatsoever. It must be a categorical, wholesale failure to consider fair use in any capacity. See Lenz, supra at 1154 ("Here, Lenz presented evidence that Universal did not form any subjective belief about the video's fair use — one way or another — because it failed to consider fair use at all, and knew that it failed to do so").

33.     In fact, not only did Lenz not embrace the idea that Spectre and many others like him seem to believe – that, as long as the secondary use is a fair use, no matter how borderline the case is, any DMCA Takedown issued against it is necessarily in violation of § 512(f) – but on multiple occasions, the Lenz court went out of its way to explicitly state that this *isn't* what they are holding! Examples of these sorts of out-of-their-way statements include ...

   (a)   Id at 1154:

   "If ... a copyright holder forms a subjective *good faith* belief the allegedly infringing material does not constitute fair use, we are in no position to dispute the copyright holder's belief even if we would have reached the opposite conclusion." (emphasis in original).

   (b)   Id at 1153-54:

   "Though Lenz argues Universal should have known the video qualifies for fair use as a matter of law, our court has already decided a copyright holder need only form a subjective good faith belief that a use is not authorized. In Rossi, we explicitly held that the good faith belief requirement in § 512(c)(3)(A)(v) encompasses a *subjective, rather than objective standard.* We further held:

   In § 512(f), Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the copyright owner's notification is a *knowing* misrepresentation. A copyright owner cannot be liable

> simply because an unknowing mistake is made, ***even if the copyright owner acted unreasonably in making the mistake.*** Rather, there must be a demonstration of some ***actual knowledge*** of misrepresentation on the part of the copyright owner."

(emphasis added; quotations and most citations omitted).

34. So ultimately, it doesn't matter if he personally disagrees with me about how fair use works. A lot of people – Spectre included – seem to believe that, because his reaction video was fair use (a presupposition with which I already disagree), then any DMCA Takedown I ever issue is necessarily in violation of § 512(f). In their minds, it doesn't even create a presumption, but is an automatic, foregone conclusion that the takedown was illegal. But that is not how it works.

35. Therefore, for him to accuse me of not considering fair use, and therefore accuse me of breaking the law, is still objectively and demonstrably false, which therefore qualifies it as slander.

### II-6: My unsuccessful attempts to get Rumble to remove the slander video

36. On September 6, 2024, I sent an email to Rumble's moderation team, asking them to remove the video for violating their terms of service, which prohibit defamatory content.

37. As of the time of this writing, they have not taken the video down.

38. Spectre already had two of his videos removed due to harassment. Had this one also been removed, he would have gotten a third community guidelines strike, resulting in his Rumble account being terminated.

### II-7: Rumble's algorithmic distribution of the slander video

39. Like YouTube, Rumble uses an algorithm to determine which videos get pushed out to more viewers. Like YouTube, Rumble offers videos for people to watch on both its home page, as well as off to the side of existing watch pages (something YouTube refers to as the "recommended videos feed"). These two sources of serving up videos are almost 100% algorithmically determined, since they require no conscious input from the viewers (e.g. search results or subscribing to a channel to receive notifications of their uploads).

40. It is almost certain that the slander video was shown in the home page and recommended videos feed by Rumble to at least some viewers. Therefore, Rumble's algorithm almost certainly promoted this video, despite them receiving written notification that the video was defamatory.

### II-8: Spectre's threatening email

41. On October 9, 2024, after I had filed the subpoena case, Spectre contacted me over email, using the email address of spectre6gaming@gmail.com, having already learned about the subpoena case. In this email, he made the following highly threatening statements:

- "local rules for the court [of the district in which I reside] are that motion hearings and conferences are held in-person without exception. That means that any conference or

- motion hearing we have, you will have to attend yourself. There is no Zoom available for federal civil cases in my district."

- "[I]f you wish to go this route... then I have no problems showing you how someone who fights back does so, and with a righteous vengeance."

- "Part of me wants you to file the lawsuit, just to have a fight."

- "I... will do everything in my power to make your life a living hell in court"

42. I interpret these statements to mean that, if I sue him, he will maliciously abuse the court system for the sole purpose of driving up litigation costs for me, just out of pure spite, and also do everything in his power to harass me. These motives are strictly forbidden under Fed.R.Civ.P. 11(b)(1), even if the overt acts being taken are, in the abstract, permitted. Therefore, this Court should view everything the Defendant does as potentially having this motive that he admits in writing to having.

## III: ARGUMENTS AND LAW

43. For the following reasons, I am entitled to prevail on the counts of copyright infringement and slander.

### III-1: Copyright Infringement

44. "The test for copyright infringement is well-established. There are two essential elements: ownership of copyright, and copying by the defendant." See Dam Things From Denmark v. Russ Berrie & Co. Inc., 290 F. 3d 548, 561 (3rd Cir. 2002).

45. The factual allegations of Sec. II-2 above sufficiently establish ownership of copyright. Furthermore, because I have a valid registration that was filed within five years of the date of first publication, that creates a rebuttal presumption of copyright validity. See 17 USC § 410(c). See also Dam Things, supra at 561.

46. Meanwhile, the factual allegations of Sec. II-3 above sufficiently allege the second essential element: Copying by the Defendant.

47. Therefore, I have alleged sufficient facts to state a claim for copyright infringement.

### III-2: Fair Use

48. Spectre is almost certainly going to attempt to argue that his reaction video is fair use. For the reasons set forth below, the defense should not apply.

49. Please note that, although I am offering to refute the claim to fair use in the Complaint, I am not required to do so at this stage. See Peterman v. Republican National Committee, 320 F. Supp. 3d 1151, 1157 (MT 2018) ("[I]t is not necessary to plead facts that disprove fair use to survive a Rule 12(b)(6) motion to dismiss"). The fact that I am offering to make a token argument here is a courtesy, not a requirement.

### III-2-A: Factor #1: Purpose and Character of the Use

50.     Criticism is often considered quintessential fair use, but that alone is not a silver bullet that guarantees fair use. Simply adding a nonzero amount of criticism does not even guarantee that the first factor will weigh in the defendant's favor, let alone the entire four-factors test set forth in 17 USC § 107. "While the analysis of the first fair use factor may be guided by the examples given in the preamble to § 107, i.e., criticism... not even these works compel a per se finding of fair use. Thus, we do not ask whether [response videos] can be fair use—they can be—but whether [the specific video before the Court in this specific case] is a transformative work." See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 452 (9th Cir. 2020) (citations and quotations omitted); cert denied 141 S.Ct. 2803 (2021). "[T]he first factor asks 'whether *and to what extent*[6] the use at issue has a purpose or character different from the original... A use that has a further purpose or different character is said to be 'transformative,' but that too is a matter of degree." See AWF Visual Arts v. Goldsmith, 143 S. Ct. 1258, 1262 (2023).

51.     As I explained in Section III-3 of this Complaint, Spectre provided only nominal amounts of original content, only some of which could arguably fit the criteria of "criticism and commentary." Just like in AWF v. Goldsmith above, the video mentioned in Section III-3 should be viewed as "nominally transformative," and therefore not favoring fair use.

52.     In addition, as I explained in ¶ 12 above, Spectre's Rumble channel is monetized. Therefore, the reaction is a *commercial* use of my video.

53.     Overall, the Court should rule in the same way the Ninth Circuit ruled in the case of Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012) ("[The Defendant's] minimal transformation of the [original work] is substantially undercut by its undisputed commercial use. On balance, the first factor is at best neutral, and does not support [the Defendant]'s claim of fair use") (citations omitted).

### III-2-B: Factor #2: Nature of the Original

54.     First, as I explained in III-2-C of this Complaint, the songs, and the video, are all unpublished. That alone should cause the second factor to weigh against fair use.

55.     As to the level of creativity, there are two ways the Court could look at the case. Remember that I am suing over the infringement of my copyrighted songs, but it was my commentary and narration that the defendants are seeking to criticize in their thinly-veiled attempt to get fair use. So which one should the Court look to when determining how to decide the second factor?

56.     It ultimately doesn't matter, because the second sub-factor weighs against fair use regardless. If we assume the music is controlling, then it's obvious that the second factor weighs against fair use, because music is inherently highly creative. But if we assume that my commentary and narration is controlling, then the Court should still consider the content to be more creative than factual. After all, the point of me making that video was to give my *opinion* on a current event. Opinions are considered creative for purposes of the second factor of fair use. See Cambridge University Press v. Patton, 769 F. 3d 1232, 1270 (11th Cir. 2014) ("Where the excerpts of Plaintiffs' works contained... the author's experiences or opinions, the District Court should have

---

6  Emphasis in original

held that the second factor... weighed against fair use"). So either way, both sub-factors of Factor #2 weigh against fair use.

### III-2-C: Factor #3: Amount and Substantiality of the Portion Used

57. As stated previously, the infringement in Section III-3 takes literally 100% of my original video, literally every single last second of it. This necessarily causes the third factor to weigh against fair use, per se, as a bright line rule. "Copying an entire work weighs against finding a fair use." See Bouchat v. Baltimore Ravens Ltd. Partnership, 619 F. 3d 301, 311-12 (4th Cir. 2010). See also Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F. 3d 1110, 1118 (9th Cir. 2000) ("While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use").

58. Frankly, the third factor is outright *molested* by Spectre's reaction. If 100% total copying doesn't weigh against fair use, nothing does, and the third factor would effectively be defined out of existence.

### III-2-D: Factor #4: Effect on the Market

59. "This last factor is undoubtedly the single most important element of fair use." See Bouchat v. Baltimore Ravens Ltd. Partnership, 619 F. 3d 301, 312 (4th Cir. 2010) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)). Moreover, it is the one factor that has been expressly affirmed by the Supreme Court as being singularly capable of negating fair use in its entirety, all on its own. "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work ... If the defendant's work adversely affects the value of any of the rights in the copyrighted work ... the use is not fair." Harper & Row at 568.

60. It is also important to note that the defendant necessarily holds the burden of proof on this issue. See Dr. Seuss v. Comicmix, 983 F. 3d 443 (9th Cir. 2020), which unequivocally calls upon the defendant, "as the proponent of the affirmative defense of fair use," to "bring forward favorable evidence about relevant markets," and stating that this is one of the few "absolute statements" when it comes to fair use. See id at 458-60. Because Spectre at least nominally monetized the slander video, market harm is presumed. See Sony v. Universal, 464 US 417, 451 (1984) ("If the intended use is for commercial gain, that likelihood may be presumed"). So I don't have to prove that the reaction video is a market substitute; he has to prove that it isn't, and he will "have difficulty carrying the burden... without favorable evidence about relevant markets." See Campbell v. Acuff-Rose Music, Inc., 510 US 569, 590 (1994).

61. That being said, Spectre copied the entirety of my original video, literally every single last second of it. This constitutes a market substitute, per se.

- See Bouchat v. Baltimore Ravens Ltd. Partnership, 619 F. 3d 301, 313 (4th Cir. 2010) ("[W]hen a commercial use amounts to mere duplication of the entirety of an original it... serves as a market replacement for it").

- See also Hustler Magazine v. Moral Majority, 796 F. 2d 1148, 1154 (9th Cir. 1986) ("[B]y copying all or substantially all of the copyrighted work, the distinction of function

vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's").

- See also Cambridge University Press v. Patton, 769 F. 3d 1232, 1271 (11th Cir. 2014) ("[W]ere a book reviewer to quote the entire book in his review... he would be cutting into the publisher's market, and the defense of fair use would fail").

- See also Consumers Union of US v. General Signal, 724 F. 2d 1044, 1051 (2nd 1983) ("The fourth fair use factor will come into play if too much is copied or if the entire plot is revealed, thereby usurping the demand for the original work").

- See also https://youtu.be/1Jwo5qc78QU?t=1158 (timestamp 19:18 - 20:22) ("Mystery Science Theater was ... absolutely transformative, but they still licensed the movies... because yeah, playing someone else's entire movie, just with wisecracks over it? Probably not fair use!").

- See also www.youtube.com/clip/UgkxDPeQBnbcZAewwjxh7tHyYQPpeMkYUrNS ("by showing those clips in full to the audience... it's entirely possible that you might not watch the [original] videos because you saw, basically, the whole thing in [the defendant]'s videos").

- See also www.youtube.com/clip/Ugkxp9Ev6N8qsYViDPqkrtAuE8nZZWpq8oD7 ("So yes, you can add some original commentary to your reaction, but if it completely displaces the market for the original, it's probably not fair use, and it's pretty obvious that, once you see a video... you're not gonna go back and watch the whole video again").

- See also www.youtube.com/clip/Ugkxznh99XHVyjyPhyQKWiWE_n8XASNgbpxW ("Honestly, were it not public domain, I don't think it would meet the transformative requirements for fair use parody protection. Large parts of the original text are copy-pasted pretty much verbatim, punctuated only occasionally with Arabella's cynical or horrified thoughts on the matter.").

62. Therefore, the fourth factor is completely violated as well.

### III-2-E: Fair Use in Conclusion

63. In conclusion, we have three of the four factors weighing definitively against fair use, with one factor (the first factor) being an extremely borderline case, given how few and far between the criticism actually is, and how undeniably commercial the site on which it is hosted is. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012) ("[The Defendant's] minimal transformation of the [original work] is substantially undercut by its undisputed commercial use. On balance, the first factor is at best neutral, and does not support [the Defendant]'s claim of fair use") (citations omitted).

64. With 3½ factors weighing against the Spectre as a matter of course, that leaves criticism as his last bastion of hope for obtaining fair use. However, with 3½ factors weighing against him right out of the gate, then unless the criticism he provides is *absolute gold* – not just disagreeing with opinions or saying that my voice is annoying, but extremely profound, downright philoso-

phical commentary, the kind that Confucius himself would tip his hat to – then his case for fair use is effectively dead on arrival.

### III-3: Slander

65. To prove a claim of slander, I must prove (A) The defendant published or verbally broadcast a false communication of fact; (B) The communication under protest is about the plaintiff; (C) The statement in question caused material or reputational harm to the plaintiff; and (D) The defendant acted either negligently or with actual malice. See **www.kellywarnerlaw.com/delaware-defamation-laws**.

66. The first element is handily satisfied. The Defendant clearly published an online video which contained the statement "he does not consider fair use." That unequivocally satisfies the first criterion of verbally broadcasting a statement of fact.

67. The second element is also satisfied because he identifies me at the start of the stream by my online alias "Acerthorn."

68. The third element is satisfied because his statements constitute defamation per se. Therefore, reputational harm is presumed.

69. The fourth element is also satisfied because, as I explained in ¶ 31 above, he subjectively knew that I do indeed consider fair use. He just disagrees with my assessment. But that does not mean I'm breaking the law when I issue the DMCA Takedown, which is what he is accusing me of doing.

70. Therefore, I have sufficiently plead the essential elements for slander.

### III-3-A: Rumble's vicarious liability under Anderson v. TikTok

71. According to the fairly recent precedent-setting case from the Third Circuit Court of Appeals, in the case of Anderson v. TikTok[7], websites can be held vicariously liable for content which they distribute, as long as said distribution is caused by their own algorithms.

72. The factual allegations II-7 above clearly establish that the slander video was most likely circulated, however nominally, because of Rumble's algorithm. Therefore, Rumble is vicariously liable for the slander.

73. Rumble is NOT vicariously liable for the copyright infringement, as I concede that they expeditiously removed the reaction video as per their requirements under the DMCA Safe Harbor provision. However, they are still liable for the limited prospective injunctive relief that I request in ¶ 78(c)-(d) below.

### IV: RELIEF REQUESTED

74. I hereby pray for the following relief:

---

7   Case No. 22-3061 in the 3rd Circuit. Although it hasn't yet had time to be published in the Federal Reporter, it is clearly marked as "precedential."

## IV-1: Declaratory Relief

75.  First, I ask for the Court to declare all of the following:

   (a)  Spectre willfully and intentionally infringed on six different copyrights;

   (b)  Spectre slandered me when he publicly accused me of DMCA misrepresentation;

   (c)  Both actions were committed out of a willful and malicious desire to inflict as much pain onto me (both emotional and economical) as possible; and

   (d)  Rumble is vicariously liable for the slander.

76.  The third declaration not only enables the Court to award statutory damages of up to $150,000 per copyrighted work infringed, pursuant to 17 USC § 504(c)(2), but also ensures that Spectre cannot discharge this debt in bankruptcy, pursuant to 11 USC § 523(a)(6).

## IV-2: Injunctive Relief

77.  For Spectre, I ask that he be ordered to ...

   (a)  cease and desist all infringement of my copyrighted content without my express written authorization, pursuant to 17 USC § 502;

   (b)  submit all his computers, smartphones, and other devices which have the potential to store my copyrighted content onto them, to the custody of a computer forensics expert of the Court's choosing, so they can be permanently and irreversibly purged of any/all instances of unauthorized content, pursuant to 17 USC § 503;

   (c)  cease and desist all instances of slandering me, including removing the slander video;

   (d)  publish a video, displayed in a prominent location on his Rumble and YouTube channels for a period of no less than five (5) years, acknowledging that I do, in fact, consider fair use.

   　i.  He may, if he so chooses, include an opinionated statement that I have an ethical duty to conduct a deeper consideration of fair use than Lenz v. Universal strictly requires, but only if he makes it abundantly clear that it is only his opinion and that this opinion is 100% subjective.

   (e)  If I prevail on the count of copyright infringement, he should also be ordered to publicly acknowledge that his video was not fair use.

   　i.  He may still give the opinion that fair use should be expanded to include videos like his reaction video, subject to the same clarity requirements as mentioned above.

78.  For Rumble, I ask that they be ordered to ...

   (a)  Remove the slander video,

(b)   Issue the final strike to Spectre's channel, terminating it, the same as if they had removed the video when I first reported it, and

(c)   permanently terminate Spectre's account with Rumble, pursuant to 17 USC § 512(j)(1)(A)(ii); and

(d)   take whatever measures are necessary to prevent future infringement of these songs, and to prevent Spectre from rejoining the site after being banned, pursuant to 17 USC § 512(j)(1)(A)(iii).

### IV-3: Damages

79.   I also ask for $900,000 in damages. This is a combination of statutory damages for all six infringed songs, as well as special, compensatory, and punitive damages for slander.

### IV-4: Other Relief

80.   I also ask for whatever other relief the Court, in its discretion, believes I should be entitled to.

### V: CONCLUSION

81.   Wherefore, premises considered, I respectfully pray that judgment be entered in my favor, costs incurred be awarded, and for any other relief to which I may be entitled.

So submitted on this, the 18th day of October, 2024.

David Stebbins
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
870-204-6516
acerthorn@yahoo.com